Slip Op. 14-137

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WHEATLAND TUBE COMPANY, | |
| Plaintiff, | |
| and | Before: Leo M. Gordon, Judge |
| UNITED STATES STEEL CORPORATION, ALLIED TUBE AND CONDUIT, AND TMK IPSCO TUBULARS, | Consol. Court No. 12-00298 |
| Plaintiff-Intervenors, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

**OPINION AND ORDER**

[Section 129 final determination remanded.]

Dated:  November 26, 2014

Gilbert B. Kaplan and P. Lee Smith, King & Spalding LLP of Washington, DC for Plaintiff Wheatland Tube Company.

Robert E. Lighthizer, Jeffrey D. Gerrish, Stephen J. Narkin and Nathaniel B. Bolin, Skadden Arps Slate Meagher & Flom LLP of Washington, DC for Plaintiff United States Steel Corporation.

Roger B. Schagrin, and John W. Bohn, Schagrin Associates of Washington, DC for Plaintiff-Intervenors Allied Tube and Conduit and TMK IPSCO Tubulars.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director.  Of counsel on the brief was Daniel J. Calhoun, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Gordon, Judge:    This action involves a U.S. Department of Commerce ("Commerce") final determination in a proceeding conducted under Section 129 of the Uruguay Round Agreements Act ("Section 129") and covering the simultaneously-imposed antidumping and countervailing duty orders on circular welded carbon quality steel pipe ("CWP") from the People's Republic of China.  See New Pneumatic Off-the-Road Tires; Circular Welded Carbon Quality Steel Pipe; Laminated Woven Sacks; and Light-Walled Rectangular Pipe and Tube from the People's Republic of China, 77 Fed. Reg. 52,683 (Dep't Commerce Aug. 30, 2012) (Sec. 129 Implementation) ("Implementation Notice"); Section 129 Proceeding Pursuant to the WTO Appellate Body's Findings in WTO DS379 Regarding the Antidumping and Countervailing Duty Investigations of Circular Welded Carbon Quality Steel Pipe from the People's Republic of China (July 31, 2012) ("Final Determination").  Commerce initiated the Section 129 proceeding at the request of the U.S. Trade Representative partly in response to the World Trade Organization's ("WTO") Dispute Settlement Body ruling that four sets of simultaneously-imposed antidumping and countervailing duty orders on Chinese imports, including the orders on CWP, may have resulted in overlapping remedies. Implementation Notice, 77 Fed. Reg. at 52,683-84; see Appellate Body Report, United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, ¶ 611, WT/DS379/AB/R (Mar. 11, 2011) ("WTO AB Report").

Before the court are the motions for judgment on the agency record of Plaintiff Wheatland Tube Company ("Wheatland"), Consolidated Plaintiff-Intervenor United States

Steel Corporation ("U.S. Steel"), and Consolidated Plaintiff-Intervenors Allied Tube and Conduit ("Allied") and TMK IPSCO (collectively, "the Domestic Interested Parties").  The Domestic Interested Parties challenge Commerce's decision to adjust the antidumping duty on U.S. CWP imports from China to account for overlapping remedies with the countervailing duty order.  Mem. in Support of Mot. of Consol. Pl.-Intervenor U.S. Steel Corp. for J. on the Agency R. under R. 56.2 1-2, ECF No. 39 ("US Steel Br."); see Mem. in Support of Mot. of Pl. Wheatland Tube Co. for J. on the Agency R. 1-2, ECF No. 41 (joining in and supplementing U.S. Steel's arguments) ("Wheatland Br."); R. 56.2 Br. of Pl.-Intervenors Allied Tube & Conduit & TMK IPSCO Tubulars in Support of their Mot. for J. on the Agency R. 1-2, ECF No. 43 (same) ("Allied & TMK Br."); see also Reply Br. in Support of Pl.'s & Pl.-Intervenors' Mots. for J. on the Agency R. under R. 56.2 at 1-9, ECF No. 58 ("Joint Reply").

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(vii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).  For the reasons set forth below, the court remands this action to Commerce for further consideration.

## I.  Background

Section 129 of the Uruguay Round Agreements Act ("URAA") sets forth procedures for managing adverse rulings and recommendations of the WTO's Dispute

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Settlement Body.  Under Section 129, the U.S. Trade Representative must consult with Congress and Commerce to decide whether to implement the rulings and recommendations that arise from an adverse finding in a Dispute Settlement Panel or Appellate Body report.  If the United States decides to implement the rulings and recommendations, the U.S. Trade Representative will request that Commerce make a determination "not inconsistent with" the Panel or Appellate Body report.  See 19 U.S.C. § 3538(b).

"A Section 129 determination amends, rescinds, or modifies the application of an agency regulation or practice in a specific antidumping, countervailing duty, or safeguards proceeding."  U.S. Steel Corp. v. United States, 33 CIT 593, 596, 627 F. Supp. 2d 1374, 1377 (2009).  It also "stands apart from the agency determination it would alter or amend." Advanced Tech. & Materials Co. v. United States, 37 CIT ___, ___, Slip Op. 13-42 at 4 (Mar. 28, 2013) (citing Statement of Administrative Action accompanying the Uruguay Rounds Agreements Act, H.R. Doc. No. 103-316, Vol. 1 at 1025, 1027 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4312-14), aff'd 541 Fed. App'x 1002 (Fed. Cir. 2013).  Section 129 proceedings are similar to other trade proceedings in that Commerce must "provide interested parties with an opportunity to submit written comments and, in appropriate cases, may hold a hearing, with respect to the determination."  19 U.S.C. § 3538(d). There are a few noteworthy differences.  Commerce must consult with Congress and the U.S. Trade Representative before implementing a final determination.  Id. § 3538(b)(3). Furthermore, the United States, through Commerce, must implement an adverse ruling

within a "reasonable period of time" under WTO rules.  See Agreement Under Article 21.3(b) of the DSU, United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, ¶ 1, WT/DS379/11 (July 8, 2011).

### A. Section 129 Implementation

Historically, Commerce did not apply countervailing duties to imports from non-market economy countries.  See generally Georgetown Steel Corp. v. United States, 801 F.2d 1308, 1313-16 (Fed. Cir. 1986) (explaining that government payments in Soviet-style non-market economies are not countervailable because they are not "bount[ies]" or "grant[s]" under the statute).  This changed in 2007 when Commerce announced that it would apply countervailing duties to subject merchandise from China.  See Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China— Whether the Analytical Elements of the Georgetown Steel Opinion Are Applicable to China's Present-Day Economy, 4-5 (Dep't of Commerce Mar. 29, 2007), available at http://enforcement.trade.gov/download/prc-cfsp/CFS%20China.Georgetown%20applicability.pdf.  Commerce explained that recent changes in China made it "possible to determine whether the Government [of China] has bestowed a benefit upon a Chinese producer (i.e., the subsidy can be identified and measured) and whether any such benefit is specific."  Id. at 10.  Commerce, however, still classified China as a non-market economy in trade proceedings.

On July 22, 2008, Commerce published antidumping and countervailing duty orders on CWP from China.  See Circular Welded Carbon Quality Steel Pipe from the

People's Republic of China, 73 Fed. Reg. 42,547 (Dep't of Commerce July 22, 2008)

(antidumping duty order); Circular Welded Carbon Quality Steel Pipe from the People's

Republic of China, 73 Fed. Reg. 42,545 (Dep't of Commerce July 22, 2008) (amended

final countervailing duty determination and order).   Commerce refused to consider

whether the simultaneous imposition of antidumping and countervailing duty orders may

have resulted in overlapping, or double counting, of remedies.  See Issues and Decision

Memorandum for the Final Determination of Sales at Less than Fair Value of Circular

Welded Carbon Quality Steel Pipe from the People's Republic of China, A-570-910, at

21-22    (Dep't    of    Commerce,    June    5,    2008),    available    at

http://enforcement.trade.gov/frn/summary/prc/E8-12608-1.pdf  (last  visited  this  date).

Commerce reasoned that there was no "demonstration . . . that the AD [antidumping] duty

that would be imposed would constitute a double remedy for practices already addressed

by the CVD [countervailing duty] investigation."  Id. at 22.  Commerce also explained that

it lacked the authority to account for double remedies because "Congress provided no AD

adjustment for CVDs imposed to offset subsidies that are not export subsidies."  Id.; see

Issues and Decision Memorandum for the Final Determination in the Countervailing Duty

Investigation of Circular Welded Carbon Quality Steel Pipe from the People's Republic of

China, C-570-911, at 101 (Dep't of Commerce, May 29, 2008), available at

http://enforcement.trade.gov/frn/summary/prc/E8-12606-1.pdf (last visited this date).

China promptly challenged the CWP and three other sets of simultaneously

imposed antidumping and countervailing duty orders before the WTO's Dispute

Settlement Body.  The WTO Appellate Body ultimately found that the United States had

acted inconsistently with its international obligations in several respects, including the

potential imposition of overlapping remedies:

> When investigating authorities calculate a dumping margin in an anti-dumping investigation involving a product from an NME [non-market economy], they compare the export price to a normal value that is calculated based on surrogate costs or prices from a third country.  Because prices and costs in the NME are considered unreliable, prices, or, more commonly, costs of production, in a market economy are used as the basis for calculating normal value.  In the dumping margin calculation, investigating authorities compare the product's constructed normal value (not reflecting the amount of any subsidy received by the producer) with the product's actual export price (which, when subsidies have been received by the producer, is presumably lower than it would otherwise have been).  The resulting dumping margin is thus based on an asymmetric comparison and is generally higher than would otherwise be the case.

> . . . .

> . . . [Commerce] made no attempt to establish whether or to what degree it would offset the same subsidies twice by imposing anti-dumping duties calculated under its NME methodology, concurrently with countervailing duties. . . . [Commerce] dismissed China's claim of double remedies on the ground that inter alia it had no statutory authority to make adjustments in the context of countervailing duty investigations.  Therefore, [Commerce] did not initiate any examination of whether double remedies would arise in the four investigations at issue and refused outright to afford any consideration to the issue or to the submissions pertaining to the issue that were presented to it.

> . . . .

> . . . Consequently, we find that, in the circumstances of the four sets of anti-dumping and countervailing duty investigations at issue, by virtue of [Commerce's] imposition of anti-dumping duties calculated on the basis of an NME methodology, concurrently with the imposition of countervailing duties on the same products, without having assessed whether double remedies arose from such concurrent duties, the United States acted inconsistently with its obligations under Article 19.3 of the SCM agreements.

WTO AB Report ¶¶ 542, 604, 606 (emphasis in original) (footnotes omitted); see id. ¶ 611. The WTO Appellate Body noted that while "double remedies would likely result from the concurrent application of antidumping duties calculated on the basis of an NME methodology and countervailing duties," double remedies would not "necessarily result in every instance of such concurrent application of duties." Id. ¶ 599 (footnotes omitted, emphasis in original).

The U.S. Trade Representative then announced the United States' intention to comply with the WTO's rulings and recommendations, and requested that Commerce make a determination "not inconsistent with" the WTO AB Report. See Implementation Notice, 77 Fed. Reg. at 52,684 (citing 19 U.S.C. § 3538(b)(2)); Communication from China and the United States concerning Article 21.3(c) of the DSU, United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, WT/DS/379/10 (May 13, 2011). Commerce initiated the underlying Section 129 proceeding on August 16, 2011. Section 129 Determination of the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: "Double Remedies" Analysis Pursuant to the WTO Appellate Body Findings WTO DS379, 6 (May 31, 2012), PD 120[2] ("Preliminary Determination").

Although the U.S. Trade Representative and the Government of China originally agreed that the reasonable period of time for Commerce to implement the WTO AB

---

[2] "PD" refers to a document contained in the public administrative record.

Report would expire on February 25, 2012, several intervening events delayed resolution of the double remedies issue. Id. at 4. On December 19, 2011, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") invalidated Commerce's imposition of countervailing duties in the non-market economy context. GPX Int'l Tire Corp. v. United States, 666 F.3d 732, 737-45 (Fed. Cir. 2011), vacated as abrogated by statute by 678 F.3d 1308 (2012), after remand, 37 CIT ___, 942 F. Supp. 2d 1343 (2013). In response Congress enacted legislation authorizing Commerce to impose countervailing duties in the nonmarket economy context, but directed Commerce to estimate and apply an offset to antidumping duties in the event of double counting. GPX, 678 F.3d at 1311; see Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265, 19 U.S.C. §§ 1671, 1677f-1 (2012).

Commerce continued the underlying Section 129 proceeding on March 28, 2012, when it sent questionnaires to the Government of China. Preliminary Determination at 6-7. Commerce ultimately issued the Final Determination on July 31, 2012, and after consulting with Congress and the U.S. Trade Representative, published the Implementation Notice on August 30, 2012. Commerce calculated and applied a double counting offset of 63.07% of the value of those countervailable subsidies that affected CWP producers' variable costs. This action followed.

### B. Commerce's Double Remedy Determination

Given the numerous adverse WTO rulings and recommendations, and their potential impact on four sets of outstanding antidumping and countervailing duty orders,

Commerce issued multiple preliminary and final determinations during the Section 129 proceeding.  Implementation Notice, 77 Fed. Reg. at 52,683-84 (listing preliminary and final determinations).   This action involves only the concurrent orders on CWP from China.  Pl.'s Compl. ¶ 2, ECF No. 10.

As noted above, during the proceeding Commerce issued questionnaires to the Government of China that requested information on whether the CWP antidumping and countervailing duty orders double counted trade remedies.   Commerce issued similar questionnaires for the three other sets of simultaneously imposed antidumping and countervailing duty orders.  The Government of China provided similar responses to each double remedy questionnaire, but provided little information specific to the CWP industry. Preliminary Determination at 7-8.

For its analytical framework, Commerce considered 19 U.S.C. § 1677f-1(f)(1) as "a matter of initial impression."  Id. at 7.  Under section 1677f-1(f)(1):

If the administering authority determines, with respect to a class or kind of merchandise from a nonmarket economy country for which an antidumping duty is determined using normal value pursuant to section 1677b(c) of this title, that –

(A) pursuant to section 1671(a)(1) of this title, a countervailable subsidy (other than an export subsidy referred to in section 1677a(c)(1)(C) of this title) has been provided with respect to the class or kind of merchandise,

(B) such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and

(C) the administering authority can reasonably estimate the extent to which the countervailable subsidy referred to in subparagraph (B), in

> combination with the use of normal value determined pursuant to section 1677b(c) of this title, has increased the weighted average dumping margin for the class or kind of merchandise,

the administering authority shall, except as provided in paragraph (2), reduce the antidumping duty by the amount of the increase in the weighted average dumping margin estimated by the administering authority under subparagraph (C).

19 U.S.C. § 1677f-1(f)(1).

Commerce preliminarily concluded that the CWP countervailable subsidies reduced the price of CWP imports by approximately 63.07%:

> Because of the high degree of similarity in industry conditions across a highly disparate group of manufactured products in these section 129 proceedings, the Department will take the information provided by the [Government of China, or "GOC,"] as representative of those in China's manufacturing sector, as a whole, during the POI [period of investigation]. In light of the compressed schedule of these section 129 proceedings after passage of [19 U.S.C. § 1677f-1(f)(1)], there was insufficient time for the Department to make further inquiries of the GOC to seek additional support for and/or explanation of certain GOC statements.  For example, although the GOC described a long-run pricing principle, there is no description on the record regarding short-run pricing dynamics, nor documentation about how specific production cost accounting categories are impacted by subsidies and which of these cost impacts, if any, factor into pricing in the short-run.

> Therefore, in order to further understand short-run pricing dynamics, the Department considered Credit Lyonnais Securities Asia (CLSA)-Markit's monthly China PMI report on Manufacturing (the Report).  The Report notes that during the POI, manufacturers in China changed output prices in response to increases in input costs over the previous month, and that only part of the cost increases were passed on to customers in the form of higher selling prices.  Moreover, the types of input cost increases that purchasing managers reported during the POI were related to changes in variable costs, such as direct labor, raw materials, and other inventoried production inputs.

Given the variable cost-(short-run) price link noted in the Report, the Department considered evidence from the record of the original AD and CVD investigations and found that for the CWP industry, purchases of hot-rolled steel were booked in the direct raw materials inventory at the cost of acquisition.   Since direct raw materials constitute a variable cost of production, the record in this proceeding—which includes the Report and evidence from the original investigations—indicates a subsidy-(variable) cost-price link in the case of input price subsidies.   The Department, however, has found no other evidence on the record of the investigations with respect to other subsidies and the cost categories that they may impact.   Therefore, for the purposes of this 129 proceeding, estimation of the extent that domestic subsidies to producers in China resulted in lower export prices, i.e. the extent of subsidy pass-through, will be limited to subsidies that are likely to have impacted variable cost, and the extent of cost pass-through will be used as a proxy for the extent of subsidy pass-through.

In order to estimate the extent to which changes in such variable costs were reflected in prices during the POI, as described in the Report, the Department calculated the average ratio of (a) rolling, monthly, year-on-year changes in production input costs to (b) rolling, monthly year-on-year changes in ex-factory prices, for the POI, using data for the manufacturing sector in China available through Bloomberg's electronic terminal.   As a proxy for the change in input production costs, the Department used changes in an aggregate production input price index.   And as proxy for changes in ex-factory prices, the Department used changes in an aggregate producer price index for the manufacturing sector in China. . . .

We recognize that the extent of input price inflation pass-through is an inexact proxy for the extent of subsidy pass-through, not only because input price inflation and subsidies push cost in opposite directions, but because the impact of input price inflation may be more uniform and systematic in nature.   As indicated above, the Department's administration of the new statutory provision may evolve with the benefit of time and experience.   The Department therefore intends in future inquiries, where appropriate and where time permits, to reassess this analytical approach, if merited.

. . .

The above-described approach leads us to conclude that approximately 63.07 percent of the value of the subsidies that have impacted variable costs, as identified above, were "passed through" to export prices for the

> CWP industry during the POI.  Based upon this finding, we are able to identify the portion of each CVD rate determined in the proceeding estimated to have increased cash deposit rates in the companion AD proceeding.

Preliminary Determination at 8-10 (emphasis in original) (footnotes omitted).

Commerce essentially used generalized Chinese domestic price data to conclude that certain countervailable subsidies reduced the average price of U.S. CWP imports. Relying on similarities in industry conditions affecting each of the four kinds of products under review, Commerce first decided to treat China's entire manufacturing sector as a proxy for the CWP industry.  Commerce then found that variable input cost increases across Chinese manufacturing, which included "labor, raw materials, and other inventoried production inputs," correlated with proportionally smaller domestic output price increases.  Commerce also found that CWP producers booked inputs at the price of acquisition, whether they were affected by the relevant subsidies or not.  Given these identified relationships, Commerce inferred that certain subsidies reducing Chinese CWP producers' input costs would correspondingly reduce Chinese domestic CWP prices (in the same way increased input prices caused ex-factory price increases across Chinese manufacturing). See Preliminary Determination at 9-10.  Commerce thus treated Chinese domestic price behavior as a proxy for U.S. CWP import price behavior, effectively presuming that changes in Chinese domestic prices correspond with identical changes in CWP import prices.  See id.  Notably, Commerce did not supplement the record with or analyze any actual U.S. CWP import price data in reaching its preliminary conclusions.

U.S. Steel, Wheatland, Allied, and TMK IPSCO, along with other domestic interested parties to the Section 129 proceeding, objected to several aspects of Commerce's determination.  Among other things, they argued that the statute placed the burden on the Government of China to "demonstrate" the subsidy's effect on the average price of imports of the class or kind of merchandise, and that the Government of China failed to do that here.  In response, Commerce agreed that under normal circumstances, "the burden is on a respondent to demonstrate its entitlement to a particular adjustment," but explained that "[t]he unique nature of these particular section 129 proceedings . . . placed certain limitations on [Commerce's] ability to solicit and receive information from parties with respect to any alleged overlap of AD and CVD remedies." Final Determination at 14.  "Despite those constraints," according to Commerce, "the [Government of China] and respondent parties did provide information necessary to [Commerce's] determinations to make adjustments under [19 U.S.C. § 1677f-1(f)] as part of these proceedings." Id.  Nevertheless, Commerce conceded that it did "supplement the record with publicly available information . . . to aid in its economic analysis." Id.

The Domestic Interested Parties also challenged Commerce's double remedy methodology.  Among the factual submissions supporting their comments, the Domestic Interested Parties included U.S. import price data and explanation and argumentation about the economics of subsidy pass-through. Final Determination at 11-15, 17-24, 27-31; see also Wheatland Tube Company New Factual Information Relating to the Department's Preliminary Double Remedy Analysis, Exs. 1, 10-11 (Dep't of Commerce

June 11, 2012), PD 129 ("Wheatland Factual Submission").  In the <u>Final Determination</u> Commerce acknowledged that Chinese "export prices/U.S. import prices of subject merchandise may be the more appropriate price measure," but nevertheless declined to analyze those measures, instead continuing to rely on Chinese domestic price data to determine the offset to the CWP antidumping duty:

> The Department agrees with Allied Tube/TMK IPSCO that PRC export prices/U.S. import prices of subject merchandise may be the more appropriate price measure.  That said, the Department has not switched to PRC export/U.S. import data for purposes of the [ratio change test, or "RCT"] in these proceedings for the following reason.  The RCT should, to the extent possible, (1) match price and cost to the subject merchandise and (2) pair cost and price series from the same universe, or group, at the firm, industry or sector level.  Only in this manner can the Department ensure that the cost series and price series are actually associated with one another.  To accomplish this, the Department relied on manufacturing sector data from the same source, with similar coverage: manufacturing sector variable costs and manufacturing sector prices.   Switching to PRC export/U.S. import data as suggested by Allied Tube/TMK IPSCO would nullify this matching and, in fact, reduce the validity of the measurement given the possibly opposite trends in domestic and export prices identified by Allied Tube/TMK IPSCO.  In order to ensure a true "apples-to-apples" cost and price comparison, the Department elected to match the price and cost series rather than rely upon a sub-group or subset of the overall manufacturing sector for prices when the cost series is measured using the entire group.  Furthermore, data constraints precluded the Department from disaggregating U.S. import data to ensure a one-to-one mapping.

<u>Final Determination</u> at 14-15, 25 (footnotes omitted).

Before the court, Domestic Interested Parties raise several arguments: (1) that the statute places a clear and unambiguous burden on the Government of China to establish the requisites of the double remedy offset, which the Government of China failed to meet; (2) that Commerce's methodology in applying a double remedy offset violates the clear

and unambiguous statutory requirements of 19 U.S.C. § 1677f-1(f); (3) that in any event,

Commerce's finding that the record "demonstrates" that the CVD order on CWP reduced

the average U.S. import prices of CWP is unsupported by substantial evidence

(unreasonable); and (4) that Commerce's estimation of the double remedy offset is

unreasonable.  See U.S. Steel Br. at 4-6; Wheatland Br. at 1-2; Allied & TMK Br. at 1-2.

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless

they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing

agency determinations, findings, or conclusions for substantial evidence, the court

assesses whether the agency action is reasonable given the record as a whole.  Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial

evidence has been described as "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States,

407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB,

305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something

less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607,

620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word

formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law

and Practice § 9.24[1] (3d ed. 2014).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).  In reviewing Commerce's finding, conclusion, or determination for substantial evidence (reasonableness), it is axiomatic that the court must first understand Commerce's explanation underlying the agency action.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm").

Additionally, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping and countervailing duty statutes.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").  The court first considers whether Congressional intent on the issue is clear.  Dupont, 407 F.3d at 1215.  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997); see Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666 (2007) ("[T]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120,

132-33 (2000))); see, e.g., Dorbest v. United States, 604 F.3d 1363, 1371-75 (Fed. Cir.

2010); AK Steel Corp. v. United States, 226 F.3d 1361, 1366-74 (Fed. Cir. 2000);

Delverde v. United States, 202 F.3d 1360, 1363-70 (Fed. Cir. 2000).  When a "court

determines Congress has not directly addressed the precise question at issue, . . . the

question for the court is whether the agency's answer is based on a permissible

construction of the statute."  Chevron, 467 U.S. at 843.  Under Chevron's second prong,

the court must defer to Commerce's reasonable construction of the statute.  See, e.g.,

United States v. Eurodif S.A., 555 U.S. 305, 887-90 (2009); Union Steel v. United States,

713 F.3d 1101, 1106-10 (Fed. Cir. 2013).

### III. Discussion

The court begins by addressing two threshold legal issues raised by Domestic

Interested Parties that implicate the Chevron framework: (1) whether the statute places a

burden on a respondent, such as the Government of China, to demonstrate that double

remedies have occurred; and (2) whether Commerce's use of indirect evidence to first

find, and then offset, double remedies in the CWP orders was consistent with the statute's

requirement that the record demonstrate that a countervailable subsidy has "reduced the

average price of imports of the class or kind of merchandise."   19 U.S.C. § 1677f-

1(f)(1)(B).

### A. Burden to Demonstrate

Domestic Interested Parties advance a lengthy Chevron step one argument that

the statute places a burden on an interested party, such as the government of China, to

"demonstrate" the requisite condition for a double counting offset (the countervailable subsidy's effect on the average price of imports).  Wheatland Br. at 3-10; U.S. Steel Br. at 25-26; see Allied & TMK Br. at 1-2.  The court though is not persuaded that the statute's vague present perfect passive clause—"has been demonstrated"—establishes Domestic Interested Parties' hoped for clear statutory burden.   The present perfect tense in the passive voice describes something that has happened in the past, but may leave unclear, as in this case, the identity of the actor, i.e., by whom the thing was done.  Paul J. Hopper, A Short Course in Grammar 190-94 (1999); Henry Weihoffen, Legal Writing Style 111 (2d ed. 1980).  It also places emphasis on the object of the verb—here, the existence of the condition for a double counting offset—rather than the subject.  See Hopper, supra, at 192-94.  Congress could have mandated that a party claiming an offset "shall" or "must" demonstrate that the countervailable subsidy reduces the average price of imports of the class or kind of merchandise, but Congress instead chose the following conditional construct: "If [Commerce] determines . . . that . . . [a] countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period[,] . . . [Commerce] shall . . . reduce the antidumping duty by the amount of the increase in the weighted average dumping margin estimated by [Commerce] under subparagraph (C)."   19 U.S.C. § 1677f-1(f)(1)(B) (emphasis added).  That formulation—with the actor unknown—is vague enough to allow Commerce some discretion to allocate evidentiary burdens for establishing the statutory criteria for a double remedy offset.

In the proceeding below Domestic Interested Parties also cited Commerce's AD/CVD regulation, 19 C.F.R. § 351.401(b)(1), which generally imposes on an interested party "in possession of the relevant information . . . the burden of establishing . . . the amount and nature of a particular adjustment."   Id.   Domestic Interested Parties contended that respondents (which include the government of China) failed to carry their burden to establish the requisite reduction in CWP import prices caused by the countervailed subsidies.   Final Determination at 13-14.   Commerce acknowledged the argument and the regulation, but explained that the "unique nature of these particular section 129 proceedings" made it difficult to solicit and receive information from the interested parties.   Id. at 14.   Commerce further explained:

> [U]ncertainty accompanying the GPX litigation at the Federal Circuit as well as questions regarding the Department's authority under domestic law to come into compliance with the [WTO]'s findings and recommendations compressed an already short time frame available to the Department to complete this proceeding.  Because section 777A(f) of the Act was enacted only in March 2012, the Department had little time or flexibility to develop and hone its practice in applying the new law for the first time in these proceedings.  To the extent that such constraints may have limited the Department's ability to make follow-up requests for information from the GOC or other interested parties, the Department was nevertheless able to supplement the record with publicly available information such as the CLSA Report and HSBC Report to aid in its economic analysis

Id. (footnotes omitted).

Before the court, Domestic Interested Parties again cite the regulation, and repeat their argument that the Government of China failed to meet their evidentiary burden.[3]  The court does not agree.  Commerce reasonably explained the unique circumstances of its Section 129 proceeding that made solicitation and receipt of information from interested parties suboptimal, causing Commerce to supplement the record on its own.

During the proceeding Commerce issued questionnaires to the Government of China and the Government of China supplied answers and information about its manufacturing sector generally but did not supply information specific to the CWP industry.  Commerce supplemented the administrative record on its own with the entire administrative records from the underlying CWP investigations as well as other information from publicly available economic sources.  Commerce then analyzed that collective information and shaped it into a "determination."  Contrary to the arguments of the Domestic Interested Parties, the statute's plain language simply does not isolate Commerce's double counting analysis to information or arguments supplied from any particular source or party.  Additionally, Commerce is generally empowered to augment the administrative record on its own, see generally 19 C.F.R. § 351.301(c)(4), and it did

---

[3] Domestic Interested Parties do not raise or challenge Commerce's interpretation of its regulation, which is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); Gonzales v. Oregon, 546 U.S. 243 (2006); Christensen v. Harris County, 529 U.S. 576, 588 (2000); Auer v. Robbins, 519 U.S. 452, 461 (1997); American Signature, Inc. v. United States, 598 F.3d 816, 827 (Fed. Cir. 2010).  Domestic Interested Parties have not argued that Commerce's interpretation of 19 C.F.R. § 351.401(b)(1) is plainly erroneous or inconsistent with the regulation.

so here.  The court, therefore, does not agree with the Domestic Interested Parties that Commerce improperly looked beyond the Government of China's arguments and submissions to determine whether double counting "has been demonstrated" on an administrative record that Commerce helped develop.

### B. "Has Been Demonstrated" Indirectly

Domestic Interested Parties also argue that the "clear and unambiguous requirements of" 19 U.S.C. § 1677f-1(f)(1)(B) compelled Commerce to use only CWP firm or industry-level data in the agency's analytical framework.   U.S. Steel Br. 4-20; Wheatland Br. at 4-10; Allied & TMK Br. at 3-6.  Specifically, Domestic Interested Parties fault Commerce for using manufacturing sector-wide data showing a correlation between Chinese domestic input price increases and Chinese domestic ex-factory price increases to conclude that certain countervailable subsidies reduced the average price of U.S. CWP imports.

Although the court understands Domestic Interested Parties' Chevron step one argument that the statute, in effect, requires direct evidence of a reduction of the average price of CWP imports, the court does not agree that the statute speaks with such clarity or precision.  Congress did not specifically require the existence of direct evidence that the CVD order reduced the average price of imports of the merchandise, but instead, as explained above, used a somewhat vague present perfect passive conditional construct: if Commerce determines "such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise."   19 U.S.C.

§ 1677f-1(f)(1)(B).  In practice, the simplest and likely best way to "demonstrate" the requisite reduction in import prices is through <u>direct</u> import price data at the firm or industry level (the class or kind of merchandise).  But this is not the same as saying that the statute mandates the use of direct import price data.  In the court's view the statute does not prohibit Commerce from attempting to "demonstrate[]" that the countervailed subsidies caused a reduction in average U.S. CWP import prices through indirect evidence of broad-based manufacturing data in China.  With that said, however, choosing that circuitous route may be difficult to justify as reasonable (supported by substantial evidence).

And that is really the central issue in this case.  Does substantial evidence support Commerce's finding that the administrative record "demonstrate[s]" that the subsidies countervailed by the CWP order reduced the average price of CWP imports?  More specifically, was it reasonable for Commerce to ultimately "presume" the requisite statutory criterion was satisfied when the Domestic Interested Parties' argument and evidence appears to show the contrary?  It is to this question that the court now turns.

### C. Reasonableness of Commerce's Finding

Commerce found that the administrative record "demonstrated" a reduction in average import prices without any analysis, and a clearly stated avoidance, of <u>direct</u> import price data.  Domestic Interested Parties take dead aim at Commerce's finding, arguing that "Commerce's analysis demonstrates, at most, that changes in the cost of inputs used in the production of all goods manufactured in China resulted in changes in

the overall average of the prices of all goods sold in China." U.S. Steel Br. at 5. According to Domestic Interested Parties, Commerce's analysis of the record does not explain whether: (1) the subsidies affected prices for the <u>class or kind of merchandise</u>, CWP; (2) the subsidies affected the price of <u>imports</u> of any kind, let alone the price of U.S. CWP imports; and (3) the subsidies' effect was a price <u>reduction</u>. <u>See</u> U.S. Steel Br. at 4-6; Wheatland Br. at 1-2; Allied & TMK Br. at 1-2.

As Domestic Interested Parties argue, Commerce's focus on broad Chinese domestic manufacturing data encompassing millions of products does not directly implicate the statute's specific requirement that a "subsidy . . . reduced the average price of imports of the class or kind of merchandise." 19 U.S.C. § 1677f-1(f)(1)(B); <u>see</u> Joint Reply at 2; U.S. Steel Br. at 21-22; Allied & TMK Br. at 4-8. Commerce made a series of inferences when concluding that the indirect evidence "demonstrated" a reduction in import prices, among them a <u>presumption</u> that any reduction in Chinese domestic prices resulting from a countervailable subsidy would be accompanied by a "corresponding reduction" in "export prices . . . to some degree." <u>Final Determination</u> at 16.

Instead of confronting Domestic Interested Parties' challenge head on, Commerce and its counsel offer apologia about a lack of time and industry level data. <u>See, e.g.</u>, <u>id.</u> at 22 (reiterating its preliminary position that "there was insufficient time for the Department to make further inquiries of the GOC or conduct a <u>de novo</u> investigation of individual firms, including with respect to industry- or firm-specific price and cost data, which may have provided a basis to further refine the pass-through estimate");

Def.'s Combined Resp. to Pl.'s and Pl.-Intervenors' Mots. for J. on the Agency R. 6, 10-11, 14-15, 17.  In fairness, Commerce found itself in difficult circumstances.  Commerce had to harmonize four sets of antidumping and countervailing duty determinations with numerous adverse WTO rulings that communicated an expectation of a "likely" double counting remedy for respondents. Commerce had a short timeframe prior to implementation.   Finally, Commerce was operating under a brand new statutory framework that limited Commerce's discretion to apply a double remedy offset.  Alongside the important motivation to bring the U.S. into compliance with the WTO rulings, Commerce also had to heed the Congressional command to "demonstrate" that the countervailable subsidies reduced the average price of U.S. CWP imports.

Commerce chose to make this demonstration indirectly through a presumption that U.S. import prices and Chinese domestic output prices respond similarly to changes in Chinese domestic input prices.  Had the Domestic Interested Parties remained silent during the proceeding, the court may have been able to accept as reasonable Commerce's decision to use increases in broad price indexes in place of more specific CWP figures because of the discernable (though tenuous) path Commerce provided to justify its approach.   Unfortunately for Commerce, the Domestic Interested Parties litigated the issue vigorously, and the Final Determination gives insufficient attention to the arguments and evidence challenging Commerce's presumption.

Domestic Interested Parties argued below that prices in the Chinese domestic market and the U.S. import market respond differently to changes in input prices.

Final Determination at 13, 15, 21-24.  Domestic Interested Parties supported this claim

with evidence detailing aggregate U.S. import price data for all imports from China, which

according to Allied and TMK IPSCO, show that "Chinese input prices are not correlated

at all with changes in the prices of U.S. imports sourced from China," unlike the Chinese

output prices Commerce relied upon.  Allied & TMK Br. at 6 (emphasis added).  Allied

and TMK IPSCO illustrated before Commerce that U.S. import prices and Chinese input

prices appear to have moved in opposite directions over much of the relevant time period.

Id. at 6-7.  Domestic Interested Parties further supported their claim with an affidavit from

an economist explaining that Chinese producers are less likely to pass on price decreases

than increases to U.S. customers, particularly decreases that competing US producers

would not experience, such as Chinese countervailable subsidies.  Wheatland Factual

Submission, Ex. 1 at 4-8.  Finally, Domestic Interested Parties placed CWP import price

data on the record.  Wheatland Factual Submission, Ex. 11.  Although Domestic

Interested Parties did not provide a detailed analysis of CWP import price data

themselves, they maintain that Commerce acted unreasonably in failing to address and

analyze this data directly.  See U.S. Steel Br. at 20-25; Wheatland Br. at 4-10; Allied &

TMK Br. at 3-10.

Recall from the discussion above that Commerce chose to use generalized

Chinese domestic price data to conclude that certain subsidies reduced the average price

of U.S. CWP imports.  Commerce relied on submissions from the Government of China

showing similarities in industry conditions affecting CWP and the other products under

review to conclude that China's entire manufacturing sector could serve as a proxy for the CWP industry.  Commerce then found that variable input cost increases across all Chinese manufacturing correlated with proportionally smaller domestic output price increases.  Commerce inferred from that relationship that countervailable subsidies reducing Chinese CWP producers' input costs would, presumably, reduce Chinese domestic CWP prices to the same extent.  Commerce explains that this presumption is similar to its historical practice in market economy cases where Commerce "generally refrain[s] from speculating about the effect of a subsidy" and does not make any adjustments for potential double remedies.  Final Determination at 15-16.  In that setting when calculating dumping margins on the same merchandise, Commerce treats countervailable domestic subsidies as if they had an identical effect on domestic output prices (normal value) and export prices.  See id.; 19 U.S.C. § 1677(5)(C).  Commerce notes that this familiar and administrable means of accounting for the price effects of subsidies is consistent with the WTO's conclusion that double remedies were "likely" in part because Commerce's non-market economy framework captures all reductions in export price caused by countervailable subsidies, but not similar reductions in domestic output prices.  See WTO AB Report ¶ 542.

This is all well and good, but the court does not believe that Commerce has sufficiently addressed why its "presumption" outweighs record evidence appearing to show that domestic output prices and export prices are not correlated, see, e.g., Wheatland Factual Submission, Exs. 1, 10-11; TMK IPSCO Submission of Evidence re

"Double Remedies" Att. 1 (Dep't of Commerce June 11, 2012); see Allied & TMK Br. at 6

(summarizing data).   Commerce has left too much unexplained.   Commerce does not

analyze or comment upon Domestic Interested Parties' economist's opinion.   Commerce

also does not analyze U.S. import data specific to CWP.   Rather, Commerce avoids

Domestic Interested Parties' U.S. import price data by explaining that it believes the

Chinese domestic ex-factory price data is a superior data source for <u>estimating</u> subsidy

pass-through:

> Only [by using Chinese domestic input and output price indexes] in this manner can the Department ensure that the cost series and price series are actually associated with one another.  To accomplish this, the Department relied on manufacturing sector data from the same source, with similar coverage: manufacturing sector variable costs and manufacturing sector prices.  Switching to PRC export/U.S. import data as suggested by Allied Tube/TMK IPSCO would nullify this matching and, in fact, reduce the validity of the measurement given the possibly opposite trends in domestic and export prices identified by Allied Tube/TMK IPSCO.  In order to ensure a true "apples-to-apples" cost and price comparison, the Department elected to match the price and cost series rather than rely upon a sub-group or subset of the overall manufacturing sector for prices when the cost series is measured using the entire group.  Furthermore, data constraints precluded the Department from disaggregating U.S. import data to ensure a one-to-one mapping.

Final Determination at 25.  Commerce acknowledges that Domestic Interested Parties'

record data may demonstrate "possibly opposite trends in domestic and export prices"

over the relevant period.  Id. (emphasis added).   Yet, when Commerce chose to use

Chinese output prices as a proxy for U.S. import prices to "demonstrate" the requisite

reduction, Commerce presumes that the countervailable subsidies caused corresponding

reductions in Chinese output prices and U.S. import prices "to some degree."  Id. at 16.

The court is missing something.  The court does not understand how Commerce may reasonably presume that Chinese domestic prices behave similarly to U.S. import prices when record data also appears to exhibit "possibly opposite trends."

Perhaps the answer lies in how one may reasonably interpret the differing data sets on the record.  Although Commerce achieves a match between the price and cost series at the broader manufacturing level, Commerce does not really explain in detail why this particular association disqualifies consideration of the more specific industry/product CWP pricing data on the record.  The implication is that there may be no way to demonstrate the behavior of the CWP pricing data in response to the countervailable subsidies.  The court, however, wonders whether Commerce's decision to focus on manufacturing level data and "presume" that broad-based Chinese domestic ex-factory prices covering millions of products can reasonably serve as a proxy for the average price of U.S. CWP imports when the statute requires a "demonstration" of a reduction in prices at the industry/product level, and more specific CWP pricing data appears available on the record.  The court must therefore remand the Final Determination to Commerce for further explanation.  See State Farm 463 U.S. at 43 (agency must articulate "a rational connection between the facts found and the choice made"); see also Diamond Sawblades Mfrs. Coal. v. United States, 612 F.3d 1348, 1355-56, 1363 (Fed. Cir. 2010) (noting

distinction between remanding for further explanation pursuant to <u>State Farm</u> and

remanding because decision is unsupported by substantial evidence).[4]

### IV. Conclusion

Accordingly, it is hereby

**ORDERED** that Commerce's assessment of double remedies is remanded for

further consideration in accordance with this Opinion; it is further

**ORDERED** that Commerce shall file its remand results on or before Wednesday,

February 25, 2015; it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order

with page limits for comments on the remand results no later than seven days after

Commerce files its remand results with the court.


                                                              ____/s/ Leo M. Gordon____
                                                                 Judge Leo M. Gordon


Dated: November 26, 2014
          New York, New York

---

[4] The court does not yet reach Domestic Interested Parties' challenge to Commerce's estimation of the double remedy offset as unreasonable.  <u>See</u> U.S. Steel Br. at 4-6; Wheatland Br. at 1-2; Allied & TMK Br. at 1-2.